## In re REAL ESTATE ASSOCIATES LIMITED PARTNERSHIP LITIGATION.

### No. CV 98–7035 DDP(AJWX).

United States District Court, C.D. California.

Aug. 29, 2002.

---

Lawrence A. Sucharow, Joseph Sternberg, Christopher J. Keller, Goodkind Labaton Rudoff & Sucharow, New York City, Nicholas E. Chimicles, Candice L.H. Hegedus, Chimicles & Tikellis, Haverford, PA, Lionel Z. Glancy, Peter Arthur Binkow, Glancy & Binkow, Los Angeles, CA, Leigh R. Lasky, Lasky & Rifkind, Chicago, IL, for Real Estates Associates ltd., Wilmonte A. Nasutavicus, Aylin Gulbenkian, Richard Henry Bolt, Jane Bolt.

Matthew P. Kanny, Mark Everett Goldman, Manatt Phelps & Phillips, Los Angeles, CA, Jack P. DiCanio, Proskauer Rose, Los Angeles, CA, Robert J.A. Zito, Caryn L. Marcus, Ruth Haber, Beth Fischbein, Kenneth G. Schwarz, Stefanie Gatti, Fischbein Badillo Wagner & Harding, New York City, for National Partnership Investments Corp., Alan I. Casden, Charles H. Boxenbaum, Bruce E. Nelson, Henry C. Casden, Nat. Partnership Investments Assoc., Nat. Partnership Investments Assoc., II, Real Estates Assoc. Ltd., Real Estates Assoc. Ltd. II, Real Estates Assoc. Ltd. III, Real Estates Assoc. Ltd. IV, Real Estates Assoc. Ltd. V, Real Estates Assoc. Ltd. VI, Real Estates Assoc. Ltd. VII.

Matthew P. Kanny, Manatt Phelps & Phillips, Los Angeles, CA, Kenneth G. Schwarz, Fischbein Badillo Wagner & Harding, New York City, for Housing Programs Ltd.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PREGERSON, District Judge.

This matter comes before the Court on the defendants' motion for summary judgment. After reviewing and considering the materials submitted by the parties, and hearing oral argument, the Court adopts the following order.

### I. Background

The plaintiffs in this class action are limited partners of eight public limited partnerships (the "REAL Partnerships") who received Consent Solicitations (the "Solicitations") in August 1998, seeking their approval for the sale of certain limited partnership interests, held by the REAL Partnerships in 98 Local Partnerships that owned apartment complexes, to a real estate investment trust (the "REIT") formed by the defendants.[1] All

---

1. The REAL Partnerships were structured in two tiers. The REAL Partnerships, or "Upper Tier Partnerships," invested indirectly in residential housing projects. The REAL Partnerships owned the limited partnership interests in other limited partnerships, or "Lower Tier Limited Partnerships." (Boxenbaum Decl. ¶ 8.) For purposes of this Order, the Court will refer to the Lower Tier Limited Partnerships as the "Local Partnerships."

Each REAL Partnership purchased limited partnership interests in the Local Partner-

of the officers and directors of the Managing General Partner of the REAL Partnerships ("NAPICO") became officers, directors and/or equity owners of the REIT. Pursuant to the approval of the limited partners, a series of transactions were effectuated on or about December 30, 1998 that resulted in the transfer of the limited partnership interests in the Local Partnerships to either the REIT or the REIT Sub.

### A. Procedural Background

The plaintiffs commenced this action on August 27, 1998. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, on June 27, 2000, the Court certified the plaintiffs to proceed with the action as representatives of the Class.[2] The Court certified a class of:

> all persons and entities who held units and limited partnership interests in Real Estate Associates Limited, Real Estate Associates Limited II, III, IV, V, VI, VII and Housing Programs Limited and were entitled to vote on or more of the consent solicitations disseminated in August 1998 in regards to those limited partnerships.

(6/27/00 Order at 18 (footnote omitted).)

On July 20, 2001, the Court issued an Order granting the plaintiffs leave to amend but denying the plaintiffs leave to file their proposed Second Amended Complaint ("SAC"). Subsequently, on August 21, 2001, the plaintiffs filed a Corrected Second Restated Amended and Supplemental Complaint (the "CSRASC"). The

Court denied the defendants' motion to dismiss the CSRASC on November 7, 2001, finding that "the issues presented in this motion would be more appropriately resolve in a motion for summary judgment or summary adjudication." (Court's 11/7/01 Order Denying Defs' Mot. to Dism.)

This matter comes before the Court on the defendants' (1) motion for judgment on the pleadings; (2) motion for summary judgment; (3) motion to adjourn dispositive motions; (4) motion in limine to exclude the testimony and expert reports of David Smith; and (5) motion for leave to file an amended answer. Also pending before the Court are the plaintiffs' (1) motion for partial summary judgment; and (2) motion seeking the application of the doctrine of judicial estoppel to preclude the introduction of evidence.

### B. Factual Background

The plaintiffs (the "Class" or the "REAL limited partners") bring suit for the dissemination of false and misleading proxy/consent solicitation statements in violation of § 14 of the Securities and Exchange Act of 1934 (the "Exchange Act"), violation of the anti-bundling rules of the Exchange Act, breach of fiduciary duty, and violation of the doctrine of inherent fairness.[3]

### 1. The Parties

The plaintiffs are a class of persons and entities, comprised of approximately 20,000

---

ships pursuant to agreements of limited partnership ("Local Partnership Agreement").

**2.** The class representatives are four limited partners who held interests in two of the eight REAL Partnerships. (Court's June 27, 2000 Order Granting Pls' Mot. for Class Cert. ("6/27/00 Order") at 2:7–13.)

**3.** The plaintiffs further seek: (1) a declaratory judgment that the Casden Defendants are not entitled to indemnification from the REAL Partnerships; (2) an order rescinding the REIT Transaction and setting aside the Class' vote as to the REIT Transaction; (3) an imposition of a constructive trust against the Casden defendants under California Civil Code §§ 2223 and/or 2224 for any recovery they may receive from actions instituted against former Local GPs; and (4) an action for accounting against all defendants.

unit-holders, who held limited partnership interests in the REAL Partnerships, and were entitled to vote on one or more of the Solicitations disseminated in August 1998 in regard to the sale of ·certain limited partnership interests in the Local Partnerships (the "Local Partnership Interests").[4]

The defendants can be divided into two groups: the Casden defendants and the REIT defendants. The Casden defendants include: (1) NAPICO and its subsidiaries;[5] and (2) Alan I. Casden, Henry C. Casden, Charles H. Boxenbaum, and Bruce E. Nelson (the "Individual Defendants"), who comprised NAPICO's Board

of Directors at all relevant times. NAPICO is a wholly-owned subsidiary of Casden Investment Corp., and Casden Investment Corp.'s sole director and stockholder is Alan I. Casden. Alan Casden is a general partner of Casden Properties, which was a sponsor of the REIT.[6]

It is undisputed that the Individual Defendants were members of NAPICO's Board of Directors, and subsequently became officers, directors and/or equity owners of the REIT. It is also undisputed that NAPICO, the Managing General Partner of the REAL Partnerships, owed a fiduciary duty to the REAL Partnerships and the

---

**4.** The REAL Partnerships, as used herein, shall refer collectively to defendants Real Estate Associates Limited, Real Estate Associates Limited II, Real Estate Associates Limited III, Real Estate Associates Limited IV, Real Estate Associates Limited V, Real Estate Associates Limited VI, Real Estate Associated Limited VII, and Housing Programs Limited.

In order to receive the approval of the REAL Partnerships for the REIT transaction, it was necessary to obtain the majority approval of the outstanding Units held by the limited partners of each of the REAL Partnerships. For all but REAL I and V, a "unit" consists of two limited partnership interests and warrants to purchase two additional interests, and were sold at an original cost of $5,000 per unit. For REAL I, a "unit" consists of one limited partnership interest that was sold at an original cost of $1,000 per unit. For REAL V, a "unit" consists of two limited partnership interests that was sold at an original cost of $5,000 per unit.

**5.** In addition to NAPICO, the other defendants, collectively referred to as the Managing General Partner, include: Casden Investment Corporation, National Partnership Investments Associates ("NPIA"), National Partnership Investments Associates II ("NPIA II"), Coast Housing Investments Associates ("CHIA"), and Housing Programs Corporation II ("HPC II"). (CSRASC ¶ 22.)

**6.** The Solicitations made a number of disclosures about the potential conflict of interest created by the fact that the REIT sponsors were affiliates of NAPICO, the Managing General Partner. For example, the Solicita-

tions disclosed the following: (1) "The terms of the Sale have not been negotiated at arm's-length." (Vol. I Defs' Ex. 3 at 209) (REAL I); (2) "The Managing General Partner has approved the Sale, has concluded that the Sale, including the Aggregate Property Valuation . . . is fair to the Limited Partners and recommends that the Limited Partners consent to the Sale. Limited Partners should note, however, that the Managing General Partner's recommendation is subject to inherent· conflicts of interest." (*id.* at 213); (3) "In evaluating the proposed Sale, Limited Partners should consider that Casden is both the sponsor of the REIT and an affiliate of the Managing General Partner. If the REIT is successfully formed and capitalized, the current owners of Casden are likely to realize a substantial increase in the value and liquidity of their investment in Casden Properties. The terms of the Sale have been determined on behalf of the Partnership by officers and directors of Casden who will directly benefit from the Sale. Unlike Casden, the Limited Partners will not participate in the REIT . . . ." (*id.* at 223); (4) "The terms of the Sale (including the Purchase Price) were established by the REIT and the Managing General Partner (which are related parties) without the participation of any independent financial or legal advisor. There can be no assurance that arm's-length negotiations would not have resulted in terms more favorable to the Limited Partners" (*id.* at 226); and (5) "The officers and employees of Casden and its affiliates will be employed by the REIT. NAPICO will become a subsidiary of the REIT" (*id.*).

limited partners. NAPICO recommended the REIT Transaction to the REAL limited partners and sought their consent to the REIT Transaction by means of the Solicitations.

The REIT defendants are the entities created and used by the Individual Defendants to purchase the REAL Partnerships' limited partnership interests in the 98 Local Partnerships in the REIT Transaction. The REIT defendants include: (1) Casden Properties Inc. (the sponsor of the REIT); (2) Casden Properties Operating Partnership (the operating arm of the REIT); and (3) Casden Properties Sub LLC (the "REIT Sub" and a subsidiary of the REIT).

### 2. The REAL Partnerships

The REAL Partnerships, as included in this litigation, are California limited partnerships that were organized between 1977 and 1984 to acquire limited partnership interests in Local Partnerships, whose purpose was to acquire ownership of and/or construct multi-family, often low income, residential properties (the "properties"). The REAL Partnerships focused their investments on properties that qualified for mortgages and housing assistance payments contracts ("HAP Contracts") under Section 8 of the United States Housing Act. These Local Partnerships were limited partnerships that held title to the properties, and also held cash, reserves for capital improvements and mortgage payments, and mortgages on the properties.

Along with the limited partners, the General Partners (the "Local GPs") also held interests in the Local Partnerships. Pursuant to the Local Partnership Agreements, the Local GPs operated, managed and conducted the business of the Local Partnerships. Together, the REAL Partnerships' interests and the Local GPs' interests constituted one hundred percent of the equity ownership interests in the Local Partnerships.

NAPICO marketed the interests in the REAL Partnerships as tax shelters.[7]

Each of the Local Partnerships was structured as a tax sheltered investment. A tax sheltered investment is one in which an initial cash investment is made for which the primary returns are tax benefits to the investor with little or no distributions of cash. These investments were particularly attractive to high income and high net worth individuals ... These investments were structured as limited partnerships and were beneficial to the investor taxpayer in the early years because they resulted in large deductions for depreciation and interest expense. As a result of this phenomenon, there is a certain point in time when the tax benefits tend to reverse themselves and result in phantom income. Phantom income is a distribution of taxable income without receiving the necessary distribution to pay the taxes on that income.

---

**7.** The original Offering Memoranda provide that the Partnership Objectives, "in order of chronological importance, are: (1) providing tax benefits on a current basis, including deductions for interest, depreciation, and taxes to the extent permitted by law; (2) obtaining reasonable protection for the Partnership's capital investments; (3) providing potential for appreciation, subject to considerations of capital preservation; and (4) providing potential for future cash distributions from operations (on a limited basis), refinancing, or sale of a project ...." (Vol. IV Defs' Ex. 13 at 1873.) The Solicitations state: "The Properties do not currently produce significant cash flow and the Partnership has not made any distributions to date. The Partnership's investment in the Properties was initially structured primarily to obtain tax benefits, and not to provide cash distributions." (Vol I. Defs' Ex. 3 at 208.)

(Defs' Ex. 25 (Schachter Expert Report) at 3335.)

The defendants contend that the REIT Transaction was structured to help the REAL limited partners exit "stale" tax shelters. (Casden Decl. ¶ 15.) According to the defendants, there were a number of reasons to exit the tax shelters, including: the decline of federal tax deductions because of the passage of time, the impending end of federal depreciation of the properties (at which time taxable income would begin to exceed cash distributions, resulting in phantom income); and the enactment of the Multi–Family Assisted Housing Reform and Affordability Act of 1997 ("MAHRAA"). (*Id.*) Therefore, via the

Solicitations, the REIT Transaction was proposed.

### 3. The Allegations

In August 1998, the Class approved the sale of the REAL Partnerships' limited partnership interests in the 98 Local Partnerships to the REIT.[8] In addition to the limited partners' approval of the REIT Transaction, as required by the Exchange Act, the REIT Transaction also depended on the sale of the Local GPs' interests in the Local Partnerships to the REIT. The Solicitations also sought the approval of the REAL limited partners for certain amendments to the REAL Partnership Agreements.[9]

8. The parties dispute whether 53% to 63% (the plaintiffs' calculations) of the limited partners approved the sale of the limited partnership interests, or 79% to 95% (the defendants' calculations).

The plaintiffs dispute the defendants' statistics because the Solicitation Statements provided that: "BECAUSE APPROVAL REQUIRES THE AFFIRMATIVE VOTE OF A MAJORITY OF THE OUTSTANDING UNITS OF LIMITED PARTNERSHIP INTEREST, FAILURE TO VOTE WILL HAVE THE SAME EFFECT AS A VOTE AGAINST THE SALE." (Vol. II Defs' Ex. 6 (REAL IV) at 632.) Therefore, the defendants' calculations (based only on consideration of those limited partners who returned a completed consent form) are distorted because they fail to take into account those limited partners who did not vote (and pursuant to the Solicitations, whose vote must be counted as a "no" vote).

9. The Solicitations sought to eliminate the following provisions from the REAL Partnership Agreements: (1) to eliminate the prohibition against the sale of REAL interests for amounts that were not at least equal to the projected tax liability created as a consequence of the sale (the "Tax Requirement"); (2) to eliminate the prohibition against the sale of "any of the Properties or Real Estate Interests to the General Partners or their affiliates" (Vol. II Defs' Ex. 6 (REAL IV) at 684); and (3) to eliminate the requirement that any agreement entered into between the Partner-

ship and the Managing General Partner (or an affiliate) may be cancelled at any time by the Partnership without penalty within 60 days prior written notice (the "Termination Provision").

The Solicitations stated: "By approving such amendment, the Limited Partners are relinquishing a potential benefit conferred by the terms of the Partnership Agreement. However, the Managing General Partner believes that as a result of (i) recent legislation relating to government-assisted housing, which is expected to reduce the cash flow from the Properties and create possible adverse tax consequences to the owners of the Properties, and (ii) the substantial negative capital accounts which most Limited Partners have which will result in recognition of significant gain on a sale of the Real Estate Interests . . ., the Tax Requirement would prevent sales of Properties . . . which are in the best interests of the Limited Partners." (Vol. I Defs' Ex. 3 (REAL I) at 224–25.)

REAL VII, IV and Housing also state: "the Managing General Partner believes that it would not be possible to find a buyer willing to purchase the Real Estate Interests under the conditions currently specified in the Partnership Agreements, because compliance with such conditions would result in a purchase price for the Properties substantially higher than their fair market value." (Vol. II Defs' Ex. 9 (REAL VII) at 1072.)

The defendants, after receiving the REAL limited partners' *approval, and negotiating to purchase the Local GPs' interests*, completed the REIT Transaction on or about December 30, 1998 (the "closing"). The transfers from the REAL Partnerships to the REIT or REIT Sub were effected by a simultaneous transaction in which the REIT or REIT Sub acquired: (i) both the limited and general partnership interests in the Local Partnerships; and (ii) interests not owned by the REAL Partnerships, including interests in other partnerships, real estate properties, management companies and other business entities, including NAPICO.[10] The amount of cash ultimately distributed to the REAL Partnerships in connection with the REIT transaction totaled approximately $20 million.[11]

The plaintiffs allege that the REIT Transaction was created solely to benefit the Casden and REIT defendants, and that if the Solicitations had contained accurate information, the Class would not have approved the transfer of the REAL Partnerships' interests to the defendants. In short, it is alleged that the defendants structured and carried out a wrongful, self-dealing transaction whereby the limited partnerships' interests were transferred to the REIT (controlled by the Managing General Partner of the Real Partnerships and the Individual Defendants) based on false and misleading statements in the Solicitations, and that the Class received inadequate consideration for its securities.

The defendants argue essentially that the REIT transaction was a fixed price offer, which included a payment of cash, and/or the assumption of debt, for the partnership interests in the Local Partnerships.

The plaintiffs seek: (1) a rescission of the REIT Transaction, including a declaration that all deeds and conveyances transferring the interests of the REAL Partnerships to the REIT defendants are null and void; (2) an award of punitive and compensatory damages against the Casden defendants for violation of Rule 14a–9 of the Exchange Act; (3) an award of damages to reflect the fair market value of the REIT Transaction; (4) restoration of the REAL Partnerships and the Class to their positions prior to the Solicitations; (5) enjoinment of the defendants from entering into any further transaction pursuant to the Solicitations and an order setting aside the Class' vote as to the REIT Transaction; (6) the removal of the Casden defendants as the general partners of the REAL Partnerships and the appointment of a receiver to administer and liquidate the REAL Partnerships' remaining assets; and (7) the award of exemplary damages under California Civil Code §§ 3294(a) and 3294(c).

## II. Discussion of Section 14(a) Claims

### A. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and … the moving party is

---

**10.** Following the REIT transaction, the Local Partnerships remained as legal entities. (CSRASC ¶ 31.) Affiliated entities to the Operating Partnership was designated as replacement general partners of the Local Partnerships to replace the Local GPs when they withdrew as part of the REIT Transaction.

**11.** According to the defendants, the aggregate APV was $502,595,282 for all REAL Partnerships. The estimated Lower Tier General

Partner Buyouts totaled $55,613,521, and the related party indebtedness totaled $425,707,901. The purchase price was $446,981,761, and Net Distributable Proceeds were estimated to be $21,273,860. The Net Distributable Proceeds figure included $14.4 million for the sale of the Limited Partnership Interests in the Local Partnerships, and distributions to the Limited Partners totaling $6,912,743 as a "tax kicker." (Defs' Response to Pls' Proposed Uncon. Fact ¶ 23.)

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. *Id.* at 252, 106 S.Ct. 2505. In determining a motion for summary judgment, all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Id.* at 242, 106 S.Ct. 2505. A court's role on summary judgment, however, is not to weigh the evidence, i.e., issue resolution, but rather to find genuine factual issues. *Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996).

### B. Analysis

#### 1. *Section 14(a) Claims In General*

Section 14 of the Securities Exchange Act of 1934 regulates the solicitation of proxies with respect to any security registered under the Act. Rule 14a–9, promulgated under section 14(a), prohibits solicitation of proxies by means of false or misleading proxy statements.[12] "The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The Supreme Court has recognized a private right of action under § 14(a). *See id.*

Count I of the CSRASC alleges a violation of § 14(a) and Rule 14a–9 promulgated thereunder against the Casden defendants. It alleges that the Solicitations were materially false and misleading for a number of reasons, and that the Limited Partners relied upon them in approving the sale of the 98 limited partnership interests in the Local Partnerships.

■ In order to establish a claim for damages under § 14(a), the plaintiffs must establish: (1) that the Solicitations contained a false or misleading statement of material fact or omission; (2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (3) that the misstatement or omission caused injury to the plaintiffs. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

■ An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. *Id.* at 449, 96 S.Ct. 2126. Stated another way, there must be a substantial likelihood that a reasonable investor would view the omitted or misleading facts as significantly altering the total mix of information made available in the proxy statement. *Id.* Section 14(a) and Rule 14a–9 do not obligate corporate officials to present, no matter how unlikely, every conceivable argument against their own recommendations. *Desaigoudar*

---

12. Rule 14a–9 provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9.

*v. Meyercord,* 223 F.3d 1020, 1024 (9th Cir.2000). They instead require that officials divulge all known material facts so that shareholders can make informed choices. *Id.* (citing *J.I. Case,* 377 U.S. at 431, 84 S.Ct. 1555). The securities laws do not require that a proxy solicitation discuss all of the arguments against, or all of the alternatives to, the proposed course of action. *Kahn v. Wien,* 842 F.Supp. 667, 677 (E.D.N.Y.1994).

## 2. *The Fixed Price Defense*

■ The defendants argue that, regardless of the adequacy of the disclosures in the Solicitations, there can be no Rule 14a–9 violation as a matter of law because the Solicitations offered a "fixed price" for the REAL Partnerships' interests. The fixed amount offered to the REAL Partnerships, as well as the fixed amount of the proposed distributions, are contained on the first page and elsewhere of each Solicitation. The REIT paid these amounts.[13]

Contrary to the defendants' assertions, the fact that the Solicitations offered a specific price for the REAL Partnerships' interests does not foreclose the possibility that triable issues of fact may exist regarding whether the Solicitations contained materially false or misleading statements, or whether the defendants breached their fiduciary duties to the plaintiffs.

For example, one of the plaintiffs' allegations is that it was a materially false and misleading statement for the Solicitations to represent that "outstanding mortgage

indebtedness" would be subtracted in order to arrive at Net Distributable Proceeds, when in fact the subtracted mortgage indebtedness was calculated using September 30, 1997 figures, and therefore not accurately described as "outstanding." The plaintiffs allege that the Solicitations concealed the "as of" date of the mortgage balances. Given this allegation, the fact that the Solicitations offered a so-called "fixed price" for the REAL Partnerships' interests is irrelevant. The specific price offered was arrived at using the very same figures that the plaintiffs attack as materially misleading (i.e. the deduction of certain mortgage indebtedness which was not in fact outstanding). Therefore, the Court rejects the defendants' "fixed price" defense and will proceed to analyze the plaintiffs' claims individually.

## 3. *The Underpayment Claim*

The plaintiffs divide the allegations comprising the § 14(a) claim into two parts: (1) the Underpayment Claim (CSRASC ¶¶ 119–140) and (2) the Hidden Assets Claim (*id.* ¶¶ 76–84).[14] In the Underpayment Claim, the plaintiffs contend that the Solicitations contained false and misleading statements about the amount due to the Limited Partners for the sale of their interests, and that the Class was damaged in that amount.

The Solicitations set forth a methodology for valuing the interests of the Limited Partners that the REIT sought to acquire. "The purchase price was determined by

---

**13.** The payments to the REAL Partnerships were the same as the amount set forth in the Solicitations, with one exception. (Spindler Decl. ¶ 39.) With respect to REAL II, the Solicitations stated that $6,500,000 would be paid whereas the actual amount paid was $5,250,000. The decrease was a result of the removal of either one or several (it is disputed) Local Partnerships from the sale prior to closing. (*Id.* ¶ 41.) These facts directly contradict the plaintiffs' assertion that they "were

not paid what was provided for in the Solicitations." (Pls' Opp. at 15.)

**14.** A third and final component of the § 14(a) claim is entitled "the Sweetheart Deals" (CSRASC ¶¶ 146–50), in which the plaintiffs allege that the defendants purchased the silence and support to the REIT transaction of the three largest holders of REAL Partnership units, thus tainting the vote.

the Managing General Partner. The Managing General Partner valued the Real Estate Interests using the following methodology." (Vol. I Defs' Ex. 4 (REAL II) at 382.) The Solicitations stated that, based on certain assumptions, the Managing General Partner arrived at an Aggregate Property Valuation ("APV") for the properties owned by the Local Partnerships and to be included in the sale.

The Managing General Partner subtracted from the Aggregate Property Valuation (i) [an amount] for the aggregate estimated value of the general partnership interests in the Local Partnerships (excluding the general partnership interests of the [ ] local general partners that are affiliates of the Managing General Partner) and the local general partners' right to future management fees ... and (ii) the outstanding mortgage indebtedness and related party indebtedness of the Local Partnerships of [an amount].

(*Id.*)

In short, the Solicitations state that the Net Distributable Proceeds to be paid to the REAL Partnerships were determined by subtracting the GP Buyout Costs from the APV to determine a Purchase Price.

Next, the Purchase Price was to be reduced by the amounts attributable to Mortgages, Related Party Indebtedness and other liabilities, including the costs of the transaction, to arrive at Net Distributable Proceeds to the Real Partnerships.[15]

### a. *Mortgage Amortization*

██ As noted above, the Solicitations stated that the Managing General Partner subtracted "the outstanding mortgage indebtedness and related party indebtedness of the Local Partnerships" from the Purchase Price in order to arrive at the Net Distributable Proceeds.

The plaintiffs contend that the Solicitations did not disclose sufficient information with respect to the mortgage balances used to calculate the Net Distributable Proceeds. Specifically, the plaintiffs contend that the defendants deducted the higher September 30, 1997 mortgage balances instead of the amounts that actually remained outstanding at the date of the closings (December 30, 1998). The plaintiffs contend that there is a $7.6 million difference between the mortgages actually assumed by the REIT and the higher September 30, 1997 balances deducted from the Purchase Price.[16] The plaintiffs claim

---

**15.** According to the plaintiffs, the Underpayment Claim seeks "judicial implementation" of the methodology set forth in the Solicitations for calculating the Net Distributable Proceeds. The plaintiffs contend that the Court should find as a matter of law that the pricing formula "was not applied as it was described," resulting in damages to the Class of more than $50 million. (I Chimicles Decl. at 2.)

The defendants argue that this claim essentially transforms the 14(a) claim into a breach of contract claim, i.e. asserting that the defendants promised to calculate the Net Distributable Proceeds using a certain methodology, the Class consented and voted for the sale, and the defendants then failed to apply the promised methodology.

For purposes of ruling on this motion, the Court interprets the plaintiffs' allegations re-

garding the Underpayment Claim as follows: that the Solicitations contained materially false and misleading statements or omissions regarding the mortgage amortization "as of" dates, Local GP Buyout Costs and Soft Notes (both their existence and the question of discount).

**16.** According to the Defendants' Supplemental Amended and Revised Objections and Response to Plaintiffs' Interrogatories, the September 30, 1997 Outstanding Mortgage Balances for the properties owned by the Local Partnerships equaled $330,458,814. (Pls' Ex. 12 at Ex. 1.1.) At Louis Eksteen's (defendants' Rule 30(b)(6) witness on the subject of mortgage balances) deposition, he produced a schedule that set forth the mortgage balances of the properties as of December 31, 1998, and calculated that they eq-

that it was materially misleading for the Solicitations to state the "outstanding mortgage indebtedness" would be deducted from the Purchase Price when the defendants in fact deducted the September 30, 1997 mortgage balance and retained the difference.

The plaintiffs argue that the Solicitations do not contain adequate information to allow a REAL Limited Partner to discern that 1997 mortgage balance information was considered in arriving at the Purchase Price. The plaintiffs contend that even Henry Casden could not determine the "as of" date for the outstanding mortgage indebtedness that was subtracted from APV upon review of Schedule III.[17]

The Solicitations contained a schedule (Schedule III) referencing the outstanding mortgage balances for each Local Partnership as of December 31, 1997. (Defs' Ex. 3 (REAL I) at 307.) Based on this information, the defendants assert that a reader could have determined that the mortgage debt used to calculate the Purchase Price was based on 1997 numbers.

Including the introductory letter and the supplemental annexes, a single Solicitation Statement approximately one 134 pages in length. In the context of a complex, lengthy document, the fact that a single schedule (found almost 100 pages into the document) referenced a December 31, 1997

date for outstanding mortgage balances is not dispositive.

Further, the defendants argue that the Solicitations do not state that mortgage debt would be amortized "as of" the date of closing, or at any time in the future. For purposes of the purchase offer, the Solicitations stated a fixed amount for the mortgage debt and related party debt. According to the defendants, the fact that an actual sum or number was used informed the reader that the debt was calculated already in the past. However, the fact that the number was calculated in the past would not necessarily inform the reader that the mortgage balances deducted were from September 1997.

#### i. Conclusion: Mortgage Amortization

The only place in the Solicitations that the defendants identify as disclosing the use of 1997 numbers in calculating the debt is three-quarters of the way through the Solicitation Statement, in a single annexed schedule. The Court finds that genuine issues of material fact exist regarding whether a reasonable shareholder would have considered this information important in deciding how to vote, and whether the Solicitations contained materially false and misleading statements or omissions with respect to the mortgage balances used to calculate the Net Distributable Proceeds.

---

ualed $319,865,459. Based on the plaintiffs' calculations, there is a $10.6 million differential.

Eksteen also testified that mortgage amortization paid by the Local Partnerships from the period October 1, 1997 to December 31, 1998 benefitted the REIT or an affiliate. (Pls' Ex. 78, Eksteen Depo. at 109.)

Without relying on any disputed expert report or opinion, but simply by reference to these exhibits, the Court finds that there is a material differential between the mortgage balances assumed by the defendants and those balances used to calculate the Purchase Price for the interests.

17. "Q: By going to those schedules, do you believe you could determine that the as-of date used is September 30th, 1997?

A: No. Because these schedules are relating to December 31 of '97.

Q: Okay. Well, if I represent to you that the date used for the outstanding mortgage indebtedness was the balances as of September 30, 1997, does that come as a surprise to you? Is that the first time you're hearing it?

A: Yes."

(Vol. XII Pls' Ex. 77 (H. Casden Depo.) at 164:16–165:4.)

b. *Soft Notes*

■ Five of the REAL Partnerships (REAL III, REAL IV, REAL VI, REAL VII and Housing) financed their purchase of the Local Partnership interests with purchase money financing evidenced by subordinated, contingent promissory notes referred to as "related party indebtedness" and "Soft Notes." The Soft Notes were used as partial payment for the acquisition of partnership interests in the Local Partnerships by REAL Partnerships. After the REIT obtained the Local General Partners' interests in the Local Partnerships, the REIT negotiated and obtained discounts on the Soft Notes.

The plaintiffs contend that the defendants paid $10.67 million for the Soft Notes but deducted the full face amount of the Soft Notes plus interest ($37.6 million) from the price being paid to the REAL Partnerships, thus diverting the benefit of $26.9 million to the REIT.[18] In short, the defendants allegedly omitted the actual purchase price of the Soft Notes and the amount of the discount from the Solicitations. The plaintiffs contend that it was materially misleading: (1) to omit to disclose the discount, and in the case of

REAL IV, REAL VI and Housing, to fail to disclose that the REIT would receive the benefit of that discount; (2) for the cover letters accompanying the Solicitations to state that the REIT would assume the Soft Note indebtedness, when, in fact, the Casden defendants had arranged to purchase the Soft Notes outright at a discount; and (3) to state that the REIT had negotiated to acquire the Soft Notes when it was in fact the Casden defendants who acquired the Soft Notes.[19] In short, the discount was material, and its amount (and who would benefit from it) was material.

The defendants respond: (1) each Solicitation for the Real Partnership indebted under the Soft Notes disclosed that the full amount of the Soft Notes were deducted in arriving at the purchase price; and (2) no Solicitation stated that a discount from any Soft Note would inure to the benefit of the Real Partnerships.[20] Therefore, it is argued, any discount from the Soft Notes did not affect the purchase price and disclosure regarding the specific amount of discounts ultimately realized by the REIT was not required. In addition, the defendants argue the plaintiffs' position that the Solicitations should have revealed the mag-

18. According to the defendants, the portion of the Buyout Costs allocated to Soft Notes was in fact $11,113,500. (*See* Defs' Ex. 57 at 3784.)

19. The plaintiffs allege that the Individual Defendants were personally involved in negotiating on behalf of the REIT the purchase terms and price of the Local GP's interests, including the Soft Notes. (I Chimicles Decl. ¶ 66.) The defendants do not dispute that Henry Casden, on behalf of the REIT, negotiated with GPs to purchase the Local GP's interests, including the acquisition of the Soft Notes. (H. Casden Decl. ¶ 3.)

20. With the exception of REAL IV, all the other Solicitations for Partnerships with Soft Notes disclosed that:

As part of its purchase of the partnership interests and management contracts of the

general partners of the Local Partnerships, the REIT has also simultaneously negotiated the purchase of certain promissory notes held by such local general partners (the "Notes") *based on an implied valuation below the face value of the Notes.* The Notes, which have an aggregate value of approximately [an amount], including accrued and unpaid interest, were issued by the Local Partnerships or the Partnership.... *In connection with its calculation of the Purchase Price, the Managing General Partner deducted the face value of the Notes from the Aggregate Property Valuation,* because the Notes represent payments due to the local general partners before any distributions from the Local Partnerships to the Partnership may be made out of the proceeds of a sale of the Properties.

(Def.Ex. 9 (REAL VII) at 1087 (emphasis added).)

nitude of the discount is without merit because: (1) the precise amount of the discount could not be disclosed because it was not known until after negotiations with the General Partners were completed;[21] (2) the precise amount of the discount was irrelevant because the Solicitations stated that the REIT, the entity paying to acquire the Soft Notes, would receive the benefit of the discount, not the REAL partnerships; and (3) because the offering price was fixed, no amount of disclosure could affect the price offered.[22]

#### i. *REAL III*

The Solicitation for REAL III disclosed that: "The benefit resulting from the pur-transaction in certain ways not available to the Limited Partners. For example, the Solicitations provided:

> The REIT believes that there are certain benefits not available to the Partnership that the REIT may be able to realize as a result of the acquisition of the Real Estate Interests held by the Partnership, the general partner interests held by the local general partners, the insured mortgage debt encumbering the Properties, and the other properties and business of Casden. These potential benefits include (i) earning fee income by performing the property management functions formerly performed by the local general partners, (ii) acquiring and restructuring (under MAHRAA) the mortgage indebtedness to which the Properties are subject, and (iii) realizing economies of scale in connection with the ownership and management of all of the Properties. *These benefits would not be available to the Partnership because it does not have sufficient capital to buy out the local general partner interests and to purchase the mortgage loans encumbering the Properties.* Such activities would also be inconsistent with the Partnership's original objectives.

(Vol I. Defs' Ex. 3 (REAL I) at 236 (emphasis added).)

The defendants argue that the plaintiffs seek to receive the benefits of the REIT transaction although it was the defendants who took the risk of spending hundreds of millions of dollars (and who, unlike the plaintiffs, had the resources to acquire the LT General Partnership Interests). In fact, the defendants argue, it was Blackacre Capital, LLC which funded the REIT with the $218 million necessary to effect the purchase of the LT General Partnership Interests and the LT Limited Partnership Interests. In other words, the defendants received the benefit of the Soft Notes discount by virtue of the use of their $218 million to purchase all of the interests.

21. "As of August 1998, when the Consent Solicitations were mailed to the REAL Limited Partners, my negotiations with the LT General Partners had not been completed." (H. Casden Decl. ¶ 7.)

The plaintiffs assert that the defendants knew the amount of the Soft Notes discount at the time the Solicitations were disseminated. (II Chimicles Decl. ¶¶ 2–9.) In reply, the defendants have submitted the declaration of Kristen Surprenant, a former Casden employee who worked on the formation of the REIT. According to Surprenant, the precise amount of consideration to be paid to the LT General Partners and the discounts on the Soft Notes was not known at the time the Solicitations were distributed. (Surprenant Decl. ¶ 7.)

The Court finds that there is a genuine issue of material fact regarding whether the amount of the discount at which the REIT would acquire the Soft Notes was known at the time of the Solicitations. The plaintiffs contend that the defendants "knew with certainty at the time the Solicitation Statements were prepared and disseminated to the REAL Limited Partners that the Soft Notes would be purchased for far less than the face amount." (I Chimicles Decl. at ¶ 63.) An earlier version of the draft REAL III Solicitation Statement around July 4, 1998 included the following sentence in the section about Soft Notes: "The Managing Partner estimates that the aggregate discount for the [Soft] Notes relating to the Partnership will be approximately $10,252,152." (Pls' Ex. 15 (Eksteen Ex. 34).) This information was not contained in the final version of the REAL III Solicitation Statement or in any of the four other Solicitations of REALS that had Soft Notes. The defendants respond that this is simply an error and is clearly nonsensical because REAL III only had $1,440,995 in Soft Notes.

22. The defendants also argue that the plaintiffs were not entitled to benefit from the Soft Notes discount, and the Solicitations disclosed that the REIT might benefit from the

chase of the Notes below the full amount inures to the benefit of the REIT." (Vol. I Defs' Ex. 5 (REAL III) at 511.) It did not disclose the amount of the discount.

### ii. *REAL IV*

The Solicitation for REAL IV did not include any of the disclosures contained in the other Solicitations about the existence of the Soft Notes, the discount, or the fact that the benefit of the discount would inure to the benefit of the REIT. REAL IV did include a chart entitled "Pro Forma Balance Sheet Adjustment" which referenced "Notes and Interest Payable." (Vol. II Defs' Ex. 6 (REAL IV) at 678.) In the "Notes to Financial Statements" section of the Solicitation, it also stated: "The Partnership is obligated on non-recourse notes ..." (*Id.* at 755.)

### iii. *REAL VI*

The Solicitation for REAL VI included the general disclosure cited above in footnote 20.

### iv. *REAL VII*

The Solicitation for REAL VII disclosed that: "The benefit resulting from the purchase of the Notes at a discount from the full amount inures to the benefit of the REIT." (*Id.*, Ex. 9 (REAL VII) at 1087.) It did not disclose the amount of the discount.

### v. *Housing*

The Solicitation for Housing included the general disclosure cited above in footnote 20.

### vi. *Conclusion: Soft Notes*

At his deposition, the defendants' expert Michael Spindler testified that the language about which entity benefits from the purchase of the Soft Notes at a discount (omitted from REAL IV, REAL V and Housing) was "relevant to put[ting] [the soft note differential] into context." (Defs'

Ex. 85 (Spindler Depo. at 104).) He also testified that he would "probably" say that the language was "the most important out of that section." (*Id.*) According to Spindler, however, he also believed that the REAL VI and Housing Solicitations contained other disclosures besides the "who benefits" language that would serve to notify a reader that the Limited Partners would not receive the benefit of the Soft Note discount. (Spindler Decl. ¶ 10.)

Three Solicitations (REAL IV, REAL VII and Housing) did not include the language explaining that the REIT alone would benefit from the Soft Note discount. In the case of REAL IV, the Solicitation failed to make any disclosure about the Notes. The Court finds that these discounts were material, and that there are genuine issues of material fact regarding whether a reasonable limited partner would have considered this information significant in deciding how to vote on the transaction, and whether the Solicitations' disclosures about the Soft Notes contained materially false and misleading statements or omissions.

### c. *Local General Partner Buyout Costs*

In determining the Purchase Price, the Solicitations disclosed that the estimated Local GP Buyout Costs would be paid and that the cost would be subtracted from the APV. "The Managing General Partner expects that the general partners of the Local Partnerships will be paid an aggregate of approximately [$ amount] for their interests in, and rights to manage, the Local Partnerships." (Vol. I Defs' Ex. 3 (REAL I) at 238.) The Solicitation continued:

> To the extent that the ultimate cost of buying out the unaffiliated local general partners exceeds the Managing General Partner's current estimate of such costs, the distributions to Limited Partners re-

sulting from the sale will be reduced. To the extent that the cost of such buyouts is less than the Managing General Partner's estimates, distributions to Limited Partners will be increased.

(*Id.*)

The plaintiffs contend that this was a materially false and misleading statement because no determinations of the "ultimate" Local GP Buyout Costs were ever computed and the Casden defendants failed to increase distributions when Local GP Buyout Costs were lower than estimated.

#### i. *Failure to Deduct Actual GP Buyout Costs*

The plaintiffs allege that the defendants over deducted $14,381,033 in Local GP Buyout Costs when compared to the actual Local GP Buyout Costs paid by the defendants, and that the defendants failed to increase distributions to the Class by the difference between the estimated and the actual buyout costs. The defendants' expert calculates that there is a $572,745 difference between the amount stated in the Solicitations for GP Buyout costs and the amount actually paid. (Defs' Opp. to Pls' Mot., Ex. 63 at 4092.)

At his deposition, Alan Casden testified that, in regard to the Local GP Buyout Costs estimated in the Solicitations, "To my understanding there was a final—these [Local GP Buyout Costs] were in flux and they were supposed to be adjusted to what the actuals were." (Pls' Ex. 76 (A. Casden

Depo.) at 412:25–413:5.) The defendants did not determine the actual GP Buyout Costs at a later time.

The defendants assert that the ultimate amount of GP Buyout Costs cannot yet be determined because of other pending litigation in the United States District Courts for the Southern District of New York and for the Middle District of Pennsylvania. (Zito Decl. ¶¶ 2–4.) In addition, the defendants argue that because the REAL Partnerships are ongoing businesses, it is premature for any final accounting with respect to the Partnerships. (*Id.*)

#### ii. *Deduction of Local GP Buyout Costs that were never paid*

The plaintiffs contend that the defendants improperly deducted certain Local GP Buyout Costs that were never paid, including: (a) defendants' "Non–Payments to Affiliates" (in the amount of $5,015,856) and (b) the Mariner's Cove Contingency Reserve (in the amount of $3,556,106). The plaintiffs attack the $5 million in costs associated with the purchase of the management rights of the twenty Local General Partners that were affiliated with the defendants, arguing that taking credit for non-payments is improper.[23] The defendants respond that the acquisition of these management rights by the REIT was properly treated as a buyout cost although it did not involve an out-of-pocket cash expenditure. Also, these deductions were disclosed in the Solicitations. (Vol. II Defs' Ex. 9 (REAL VII) at 1086–87) ("No

---

**23.** The Local GP Buyout Costs for local general partners affiliated with Managing General Partner consisted of their right to receive future management fees but not their partnership interest. The costs for unaffiliated local general partners were for the partnership interests and their right to future management fees. The actual amounts paid to the unaffiliated local general partners varied based upon the negotiations with the local general partners.

The plaintiffs contend that, for 20 of the affiliated Local GPs involved in the REIT transaction, the defendants subtracted approximately $5 million from the APV, for the right to receive future management fees, but that amount was never paid to the affiliated GPs. Instead, only nominal amounts were paid.

value was attributed to the affiliated general partners' general partnership interests in Local Partnerships."). The defendants also assert that other liabilities were assumed, for example, in the case of Mariner's Cove, where a $3.6 million ground lease liability was assumed.

### iii. Deduction of Local GP Buyout Costs Already Paid

The plaintiffs contend that although the Local Partnership interests in two projects (Bradley and Farrell) had already been acquired through litigation, the plaintiffs paid the buyout costs in connection with the REIT transaction. The defendants dispute that anything was paid for these interests in connection with the REIT transaction. (Defs' Opp. to Pls' Mot., Ex. 63 (Spindler Rebuttal Report).)

The plaintiffs also contend that the defendants improperly deducted certain Local GP Buyout Costs that included amounts already deducted as part of defendants' subtraction made for Soft Notes. The plaintiffs claim that, in the case of Management Alliance Properties, the face amounts of the Soft Notes were deducted twice, first as General Partner Buyout Expense, and second as a Soft–Note payment expense. The defendants respond that such deductions had no economic effect on the plaintiffs. (Spindler Decl. ¶ 26.)

### iv. Conclusion: Local GP Buyout Costs

The Court finds that there are genuine issues of triable fact regarding whether the Solicitations contained materially false or misleading statements regarding Local GP Buyout Costs.

### d. Conclusion: Underpayment Claim

The Court finds that there are genuine issues of triable fact regarding the plaintiffs' "Underpayment Claim," and that the defendants are not entitled to summary judgment. In particular, although not exclusively, the Court notes that the Solicitations provided that the REIT would assume "certain mortgage and related party indebtedness," and in each case, listed the amount of the debt that the REIT would assume. It now appears that the REIT did not in fact assume the stated amount of debt, and that the REIT in fact assumed millions of dollars less in debt than the Solicitations described. These facts alone raise a genuine issue of material fact regarding whether the Solicitations contained false and misleading statements or omissions.

### 4. The Hidden Assets Claim

The plaintiffs allege that the defendants failed to disclose the full value of the partnership assets which were proposed for sale in the Solicitations, in violation of § 14(a). The plaintiffs contend that the REAL Partnerships had contractual rights in all the assets of the Local Partnerships. However, the plaintiffs argue, the Solicitations improperly focused solely on the properties, to the exclusion of all other assets of the Local Partnerships, by informing the Limited Partners that their approval was being sought to sell to the REIT only certain "Real Estate Interests," or "the sale of the interests of the Partnership . . . in the real estate assets." (Vol. I Defs' Ex. 4 (REAL II) at 345.) In short, by focusing solely on the properties, to the exclusion of other assets of Local Partnerships, the defendants allegedly misrepresented or concealed the existence, amount, and materiality of the Local Partnerships' "assets other than Properties."

### a. The Plaintiffs' Interests In the Local Partnerships' Assets

The defendants argue that the plaintiffs did not have any interest, as a matter of law, in the assets of the Local Partner-

ships. A limited partner does not have a property interest in specific partnership assets. Cal.Corp.Code § 15671; *see also Wanetick v. Mel's of Modesto, Inc.*, 811 F.Supp. 1402, 1409 (N.D.Cal.1992); *Evans v. Galardi*, 16 Cal.3d 300, 128 Cal.Rptr. 25, 546 P.2d 313 (1976). Instead, the plaintiffs held limited partnership interests in other limited partnerships which owned low-income housing projects.[24] The Court rejects the plaintiffs' position that the REAL Partnerships (and thereby the REAL Limited Partners) had an ownership interest in all of the property of the Local Partnerships by virtue of the REAL Partnerships' ownership of the limited partnership interests in the Local Partnerships.

However, the Local Partnership Agreements provide that the REALs were entitled to receive distributions of cash from operations, annually. (*See e.g.*, Pls' Ex. 93 (Norristown Local Partnership Agreement) at NAP–JJJ–00283.) Therefore, as limited partners, the REAL Partnerships would be entitled to a percentage of cash as provided by the partnership agreements. On average, in 1996 and 1997, the defendants state that the REAL Partnerships would have been entitled to 69% of the surplus cash.[25]

b. *Surplus Cash*

■ The plaintiffs contend that the Solicitations omitted disclosures about cash assets held by the Local Partnerships in which the REAL Partnerships had an ownership interest, and that $9 million of this allegedly undisclosed cash was transferred to the REIT escrow at FATCOLA

at and prior to closing. In short, it is alleged that: the defendants stripped $9 million in cash from the Local Partnerships and transferred it to the REIT before closing and before preparation of 1998 audited financial statements, and that the cash belonged to the REAL Partnerships, representing 1997 and 1998 cash from operations, and that the cash was material in light of the Net Distributable Proceeds of $20 million actually paid to the Class.

The plaintiffs contend that it was materially misleading for the Solicitations to omit the word "cash" from the language and instead only to refer to "assets other than Properties." The plaintiffs claim that the term "assets other than Properties" was ambiguous and that no reasonable reader of the Solicitations would have understood it to mean cash and reserves. Therefore, the plaintiffs claim an entitlement to the distribution of cash from 1997 and 1998 operations held at the Local Partnership level on the ground that there was no disclosure in the Solicitations that cash earned while the REAL Partnerships owned an interest in the Local Partnerships (i.e. through the date of closing) would be directed to the REIT.

The defendants' response is two-fold. First, the defendants contend that the REAL Partnerships did not own cash and reserves in the Local Partnerships, but only securities in the form of Local Partnership Interests. Therefore, the cash and reserves were not "Hidden Assets" of the REAL Partnerships. The REAL Partnerships sold its securities in the Lo-

---

24. The plaintiffs of course dispute this vigorously. "A REAL Partnership's interests in a Local Partnership would necessarily reflect the value of all assets of the Local Partnership, not just the real estate." (I Chimicles Decl. ¶ 175.) The plaintiffs claim that the REALs had contractual entitlements in these assets pursuant to the Local Partnership Agreements. (I Chimicles Decl. ¶¶ 165–81.)

25. For example, in 1997, approximately $4,912,686 in cash was distributed to the REAL Partnerships. (Pls' Ex. 12 at Ex. 2.4.) In 1996, approximately $4,871,527 in cash was distributed to the REAL Partnerships. (Pls' Ex. 12 at Ex. 2.5.)

cal Partnerships but the Local Partnerships did not sell their assets. The plaintiffs simply had no interest in the cash and, after the transfer of the interests, were no longer entitled to any distributions.[26]

The issue of the surplus cash is, however, distinct from the dispute about whether the plaintiffs had any ownership interests in the assets of the Local Partnerships. The defendants admit that distributions of unrestricted cash were made from the Local Partnerships to the REAL Partnerships in 1996 and 1997 pursuant to the terms of the Local Partnership Agreements. Of this surplus cash, the defendants argue, the REAL Partnerships would only be entitled to a percentage of the cash as provided by the partnership agreement. (Spindler Reply Decl. ¶ 37.) On average in 1996 and 1997, the REAL Partnerships were entitled to only 69% of the surplus cash that was distributed. (*Id.*)

Thus, the question becomes whether the Solicitations contained material misstatements or omissions regarding the plaintiffs' contractual entitlements to cash from 1997 or 1998 operations. The defendants assert that the surplus cash available as of December 31, 1998 belonged to the buyer (i.e. the REIT).[27] The defendants' expert, Spindler, concluded that the amount of cash actually available for distribution as of December 31, 1998 was $7.3 million.[28] (*Id.*) He also concluded:

> The valuation methodology was disclosed in the Consent Solicitations and was based on 1996 operating data and September 30, 1997 balance sheet data. It is our understanding that the defendants take the position that since the buy-out was done as of September 1997, subsequent surplus cash would inure to the buyers. Since surplus cash is gener-

---

**26.** However, Alan Casden testified:

> Q: In your view, to whom did the bank accounts and those other assets belong?
> A: Well, we bought partnership interest so we owned the partnership. It belonged to the partnership that we bought.
> Q: But to whom did those assets belong before you bought them?
> MR: ZITO: Objection.
> THE WITNESS: It belonged to the local GP and the limited partners or to the REAL funds. Whoever owned them....

(Pls' Ex. 76 (A. Casden Depo.) at 117:3–15.)

**27.** It is the defendants position that:

> "Since surplus cash is generally distributed annually, the $7,189,185 of surplus cash as of December 31, 1998 relates to 1998 operations and thus, belongs to the buyer. The distribution occurred in January of 1999. Even assuming arguendo that the REAL Partnerships could establish an entitlement to such surplus cash, $762,299 of that surplus cash would have to be applied to the indebtedness of the REAL Partnerships to NAPICO.
> The 1999 surplus cash was distributed in 1999, rather than in the year 2000, because

as part of the REIT Transaction, the REIT obtained control over the cash distributable from the local limited partnerships."
(Pls' Ex. 12 (Defs' Suppl. Amended & Revised Obj. & Resp. to Pls.' Ints.), Resp. 2 at p. 7; Ex. 2–4 and 2–5.)

**28.** However, at his deposition, Charles Boxenbaum was asked:

> Q: Whom do you believe should have received the benefit of cash from operations from local partnership operations in 1998?
> A: The local general partner and the general partnerships.
> Q: Which partnership?
> A: The selling partnership.
> Q: The REAL Partnerships?
> A: Uh-huh.
>
> . . . . .
>
> Q: ... Do you have any recollection of being told that cash from operations from 1998 were going to be transferred to the REIT?
> A: No.

(Pls' Ex. 75 (Boxenbaum Depo.) at 120:6–121:15.)

ally distributed annually, the $7,345,224 of surplus cash as of December 31, 1998 relates to 1998 operations and, thus, belongs to the buyer. Additionally, there is at least an equal amount of seller costs paid by the buyers related to this transaction that have not been charged to the sellers.

(*Id.*)

Finally, the defendants argue that the Solicitations disclosed that value was not ascribed to the cash and reserves.[29] The Solicitations disclosed that the cash was not considered part of the purchase price because the REIT was also assuming certain liabilities. The Solicitations provide:

> In determining the valuation of the REAL Estate Interests, *no adjustment was made for the amount by which the value of the assets other than the Properties exceeded liabilities other than mortgage and certain related party indebtedness because the Managing General Partner does not believe these assets are material* (other than the Reserve Accounts referred to below). In addition, pursuant to certain state housing finance statutes and regulations, certain of the Local Partnerships are subject to limitations on the distributions of dividends to the Partnership. Such statutes and regulations require *such Local Partnerships to hold cash flows in excess of such* dividend limitations in Reserve Accounts that may be used only for limited purposes. *The Purchase Price was calculated without attributing value of the Reserve Ac-*
> counts. The Managing General Partner believes that federal and state regulatory considerations limiting the availability of the Reserve Accounts to the Partnerships *have the effect of substantially reducing or eliminating entirely any value attributable to such Reserve Accounts. Nonetheless, the REIT may be able to realize a benefit in the future by obtaining a reduction in the amount required to be held in the Reserve Accounts.* The Partnership held approximately [an amount] in such Reserve Accounts at December 31, 1997.

(Vol. I Defs' Ex. 3 (REAL I) at 249 (emphasis added).)

It is undisputed that distributions of unrestricted cash were made from the Local Partnerships to the REAL Partnerships in 1996 and 1997.[30] (Pls' Proposed Uncon. Fact ¶ 94.) It is the defendants' position that: "After the transfer of interests, the plaintiffs were no longer entitled to distributions." (Defs' Response to Pls' Proposed Uncon. Fact ¶ 90.) However, the plaintiffs' position is that they remained entitled to certain cash distributions as long as they continued to own the limited partnership interests, and that the REIT improperly diverted these funds into an escrow account rather than distributing them in accordance with the Local Partnership Agreements. The Court finds that genuine issues of triable fact exist regarding whether the Solicitation contained false or misleading statements or omissions about the plaintiffs' entitlement

---

**29.** The defendants contend that value was not attached to these assets because the Purchase Price was calculated based on a capitalized income approach and because cash and reserves do not contribute to such income, no value was attributed to them. The Solicitations disclosed that: "the Managing General Partner determined the value by taking the aggregate net operating income before interest expense and management fees … for

such Local Partnership for 1996, less capital expenditures, and applied a capitalization rate of 11%." (Vol. II Defs' Ex. 6 (REAL VI) at 671.)

**30.** Cash distributions were made to the limited partners of the REAL Partnerships on one occasion only, in December 1998. (Defs' Ex. 9 (REAL VII) at 1067.)

to any distributions of cash from the Local Partnerships' operations for calendar years 1997 and 1998.

#### c. Reserves

Each of the Local Partnerships that owned Section 8 properties were required to keep specified types of mortgage escrows and reserves (for capital improvements and maintenance, and for profits in excess of the percentage that the Local Partnerships could distribute in a given year).[31] The plaintiffs argue that in the Solicitations, the defendants misrepresented and understated the magnitude of the aggregate reserves in which the REAL Partnerships held an interest. Through nondisclosure of the magnitude of the reserves and escrows, coupled with the misrepresentations that they had no value, it is alleged that the Casden defendants took valuable assets for the REIT. Specifically, it is alleged that only $5 million in reserves were disclosed instead of $35 million actually held by Local Partnerships.

With respect to the reserve accounts, the defendants argue that not only do the REAL Partnerships not own the reserve accounts, but further that various regulatory agreements with the HUD mean that HUD essentially owns the cash in these residual receipt accounts. The defendants also argue that, regardless of the amount of the reserves, the specific amounts and types of reserves did not affect the purchase price because it was a "fixed price" deal and therefore the reserves could not have been material. The Court has already rejected this argument. Finally, the Solicitations stated that the Purchase Price was calculated without attributing

value to reserve accounts. Each Solicitation stated that federal and state limitations on the use of reserves substantially reduced or eliminated their value and that, therefore, the purchase price was calculated without attributing value to the reserve accounts.

The Court finds that genuine issues of material fact exist regarding whether the Solicitations contained materially false or misleading statements or omissions about the reserves.

#### d. Conclusion: Hidden Assets

The Court finds that triable issues of genuine material fact remain as to whether the Solicitations adequately disclosed that cash from 1997 and 1998 operations would go to the REIT rather than to the plaintiffs, and the adequacy of the Solicitations' disclosures regarding the Local Partnerships' reserves.

### C. Conclusion Section 14(a) Claim

#### 1. Valuation and Santa Fe Industries

■ According to the defendants, by adjusting the manner in which the Purchase Price for the Local Partnership interests was determined, the plaintiffs are simply putting forth their opinion regarding the value of the plaintiffs' interests, or how the interests should have been valued. The Solicitations explicitly disclosed that other methods existed for valuing the interests at issue. (See e.g., Vol. I. Defs' Ex. 3 (REAL I) at 249 ("Different assumptions would likely have resulted in different valuations for the Real Estate Interests.").) Therefore, the defendants argue, at heart

---

**31.** It is undisputed that a portion of the cash flow of the properties must be held in the local limited partnerships as reserves for such purposes set forth in the Housing Act and local regulations. The defendants contend that the cash could not be used by the Local Partnerships and, upon exiting the Section 8 program, would become the property of HUD or a state agency. (Defs' Stmt.Uncon. Facts ¶ 4.) The plaintiffs contend that the cash was available for distribution in certain circumstances, and that the Casden defendants misrepresented and concealed this fact.

this is nothing more than a dispute about the proper valuation of the Local Partnership interests. A valuation dispute, however, is not actionable under federal securities law. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (holding that "once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute."); *Stepak v. Aetna Life & Cas. Co.,* 1994 WL 858045 * 11 (D.Conn.) ("the plaintiff asserts that Aetna's appraisal practices and valuation methodology, as well as Aetna's nondisclosure of those policies in their reports to shareholders, violate the federal securities laws. The court concludes that the plaintiff's claim constitutes a claim of corporate mismanagement, not actionable under the securities laws."). While the plaintiffs may complain about the adequacy of the price set for the REIT transaction, it is argued, the terms of the transaction were adequately disclosed, precluding § 14(a) liability. *Gluck v. Agemian,* 495 F.Supp. 1209 (S.D.N.Y.1980).

However, as discussed above, the Court finds that there are triable issues of genuine material fact regarding whether "full and fair disclosure" occurred in this case, thus distinguishing it from *Santa Fe,* or other cases where the dispute was reducible to competing notions of the value of the underlying interests. In this case, factual disputes remain about the adequacy of the disclosures in the Solicitations, and therefore, the defendants' characterization of the action as nothing more than a dispute about valuation is inaccurate.

### 2. *In General*

The defendants contend that the alleged omissions from the Solicitations were readily discernible through a reading of that document, and that the plaintiffs could have used "simple addition" to determine, for example, that the mortgage debt used to calculate the purchase price was based

on 1997 numbers. *See, e.g., Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1, 5 (2d Cir.1983) (no securities fraud in failing to state conclusion that was "obvious to anyone conversant with elementary mathematics"); *Howell v. Management Assistance, Inc.,* 519 F.Supp. 83, 90 (S.D.N.Y.1981) (no violation of proxy solicitation rules where "cash flow calculations could be easily made, as plaintiff testified he had done, from the data in the proxy materials").

However, the plaintiffs' allegations are distinguishable from those cases, cited above, where critical calculations could easily be made or certain conclusions were obvious to anyone conversant in basic mathematics. In this case, the complexity of the REIT transaction and the length of the Solicitations meant that the calculations and conclusions set forth in the Solicitations were comprehensible only to those with a high level of expertise and familiarity with the REIT transaction. Given this context, the Court finds that triable genuine issues of material fact remain regarding the plaintiffs' "Underpayment Claim," and the plaintiffs' "Hidden Assets Claim," and whether the Solicitations contained material misstatements or omissions in violation of § 14(a) of the Exchange Act.

### III. Breach of Fiduciary Duty Claim

The plaintiffs claim that the defendants breached their fiduciary duty by failing to fully and completely disclose all the facts surrounding the REIT transaction.

### A. *The Individual Defendants Do Not Owe the Plaintiffs a Fiduciary Duty*

It is undisputed that, as managing general partner, NAPICO owes a fiduciary duty to the plaintiffs. Under California law, "a fiduciary relation arises whenever confidence is reposed on one side, and

domination and influence result on the other." *In re Abrams,* 229 B.R. 784, 791 (9th Cir.BAP 1999) (internal quotation & citation omitted).

Partnership is a fiduciary relationship, and partners are held to the standards and duties of a trustee in their dealings with each other. *BT–I v. Equitable Life Assurance Soc'y,* 75 Cal.App.4th 1406, 1411, 89 Cal.Rptr.2d 811 (1999). Partners are obligated to account to the partnership for any benefit, and hold as trustee for it any profits derived without the consent of the other partners from any transaction connected with the conduct of the partnership. *Id.* In California, "partners are trustees for each other, and in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind." *Leff v. Gunter,* 33 Cal.3d 508, 514, 189 Cal.Rptr. 377, 658 P.2d 740 (1983) (internal quotation & citations omitted). The Ninth Circuit has interpreted this language as raising "the duties of partners beyond those required by the literal wording of [California Corporations Code] § 15021." *Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir.1986).

The defendants dispute that the Individual Defendants owed any fiduciary duties to the Class. According to the defendants, the fiduciary relationship creates a right for a limited partner to bring an action only against the general partner, not the officers and directors of the general partner. *Western Camps, Inc. v. River-*

*way Ranch Enters.,* 70 Cal.App.3d 714, 730, 138 Cal.Rptr. 918 (1977) (holding that the corporate general partner is solely liable for the obligations of the limited partnership and that limited partner has no personal liability for such obligations).

In *Mieuli v. DeBartolo,* the plaintiff, a limited partner, argued that an individual defendant, DeBartolo, could be directly liable on the basis that the general partner, S.F., Inc., acted as DeBartolo's alter ego, and that DeBartolo acted as the "de facto" general partner of the Partnership. 2001 WL 777091 (N.D.Cal.). In this case, there are no allegations that, along with NAPICO, the Individual Defendants acted as "de facto" general partners of the REAL Partnerships. It is alleged that the Individual Defendants were officers and directors (Boxenbaum and Nelson), director (H. Casden), and director and sole owner (A. Casden).

In *Maywalt v. Parker & Parsley Petroleum Co.,* the court interpreted Texas law to find that:

> Under Texas law, a fiduciary relationship generally exists only between the general partner and the limited partners. This fiduciary relationship creates a right for a limited partner to bring an action only against the general partner, not the officers and directors of the general partner. The one exception to this general rule arises when the actions of a shareholder of the general partner are such that it is appropriate to "pierce the partnership veil" to hold him personally liable to the limited partners.

808 F.Supp. 1037, 1059 (S.D.N.Y.1992) (citations omitted); [32] *but see Tobias v. First*

**32.** The *Maywalt* court also noted that Pennsylvania law recognizes a fiduciary relationship between general partners and limited partners. *Clement v. Clement,* 436 Pa. 466, 260 A.2d 728 (1970). However, unlike the exception recognized by the Texas courts, the Pennsylvania Supreme Court has refused to pierce the partnership veil and find the shareholders of corporate general partners liable to limited partners for breach of fiduciary duty. *See In re Estate of Hall,* 517 Pa. 115, 535 A.2d 47 (1987). There is no California authority directly on point.

*City Nat'l Bank & Trust Co.*, 709 F.Supp. 1266 (S.D.N.Y.1989) (denying motion to dismiss breach of fiduciary claim brought by limited partners against president, director and sole shareholder of general partner).

The plaintiffs claim that the Individual Defendants owed fiduciary duties to the Class because, in their capacities with NAPICO, they controlled, dominated and used NAPICO to carry out the REIT transaction. In *In re Abrams*, 229 B.R. 784 (9th Cir.BAP 1999), the court held that the general partner of the general partner of a limited partnership was a fiduciary of the limited partnership because of the high degree of control the defendant exercised over the project at issue. *Id.* at 792.[33]

In this case, the plaintiffs have failed to allege facts or establish that the actions of the Individual Defendants with respect to NAPICO are such that it is appropriate to "pierce the partnership veil" to hold them personally liable to the Class. The Court finds that the Individual Defendants did not owe fiduciary duties to the Class, and that the plaintiffs' cause of action is proper against NAPICO, the Managing General Partner, only.

### B. *Liability*

■ The Court finds that genuine issues of material fact exist regarding the breach of fiduciary duty claim against NAPICO, and denies the defendants' motion for summary judgment. The following is a non-exhaustive list of some of the triable issues of fact that the Court finds remain with respect to the plaintiffs' breach of fiduciary duty claim against NAPICO.

### 1. *Mortgage Amortization*

The plaintiffs contend it was a breach of fiduciary duty to use the September 1, 1997 mortgage balances, instead of the amounts that actually remained outstanding at the date of the closings, because the Casden defendants wrongfully converted five quarters of the mortgage payments to the benefit of the REIT. The plaintiffs contend that the defendants impermissibly extracted payment from the Limited Partners for a debt that was already paid, and wrongfully appropriated partnership property for their own gain. *People v. Sobiek*, 30 Cal.App.3d 458, 106 Cal.Rptr. 519 (1973); *Oakdale Village Group v. Fong*, 43 Cal.App.4th 539, 545–46, 50 Cal.Rptr.2d 810 (1996). The Court finds that triable issues of fact exist with respect to this issue.

### 2. *Soft Notes*

The plaintiffs contend that it was a per se violation of the Casden defendants' fiduciary duties to arrange for the REIT to acquire the Soft Notes at less than the face value (and in the case of three of the REALs, to fail to disclose that the REIT and not the limited partners would benefit from the discount), and to conceal the discount but deduct the full face amount from the APV.

The plaintiffs argue that where a partner acquires a partnership obligation at a discount, he does so on behalf of the partnership and his co-partners, and each partner is entitled to share in the discount. Therefore, the partner may not seek to recover the full amount of the obligation from the partnership or his partners in

---

**33.** In *Abrams*, the court found that the plaintiff's allegations of alter ego liability were sufficient to support certain claims against the general partner's general partner (including breach of fiduciary duty) on a theory of de facto partnership. Thus, the court's holding was that a general partner's general partner may owe a fiduciary duty to the limited partner in cases where that "second-tier" general partner is in fact the alter ego of the "first-tier" general partner.

order to retain the discount for himself. *BT–1 v. Equitable,* 75 Cal.App.4th at 1411, 89 Cal.Rptr.2d 811. The plaintiffs contend that the opportunity to purchase the Soft Notes at a discount was a partnership opportunity belonging to the REAL Partnerships, not to the REIT or the Casden defendants. Cal.Corp.Code § 16404(b). The Court finds that triable issues of fact exist with respect to this issue, in particular whether the limited partners were entitled to share in the benefit of the Soft Notes discount.

### 3. *Local GP Buyout Costs*

The plaintiffs attack the defendants' conduct in relation to the calculation of the Local GP Buyout Costs on a number of grounds, including the failure to increase the Purchase Price in order to reflect the "actual" costs of the Buyouts. The Court finds that triable issues of fact exist with respect to this issue.

### 4. *Cash and Reserves*

The plaintiffs contend that, given their rights to the assets of the Local Partnerships, it was a breach of fiduciary duty for the defendants to acquire the unrestricted cash of the Local Partnerships without compensation to the REAL partnerships. Similarly, the plaintiffs contend that the defendants improperly took the reserves for the REIT without compensating the REAL Partnerships.

A fiduciary's purchase or sale of partnership assets without a full disclosure of their value constitutes a breach of fiduciary duty as a matter of law. *Lund v. Albrecht,* 936 F.2d 459 (9th Cir.1991) (affirming summary judgment in favor of plaintiff where defendant partner failed to disclose an offer to purchase partnership assets for $2 million to $4 million more than value assumed in dissolution negotiations with plaintiff).

The Court finds that triable issues of fact remain regarding whether NAPICO breached its fiduciary duty to the plaintiffs in regard to REIT's acquisition of cash from operations for the 1997 and 1998 years, and the Reserve Accounts.

### C. *Standing*

■■■ The defendants also argue that, as limited partners, the plaintiffs lack standing to assert claims for wrongs allegedly committed against the partnership, and that their claims are derivative in nature. The defendants contend that the wrong or injury the limited partners incurred, if any, is incidental to the wrong suffered by the REAL Partnerships. The recovery must go to the REAL Partnerships, not to members of the Class. *Mieuli v. DeBartolo,* 2001 WL 777091 * 10 (N.D.Cal.2001); *Pareto v. F.D.I.C.,* 139 F.3d 696 (9th Cir. 1998).

The plaintiffs point out that the Solicitations sought the consent of the Class to the REIT Transaction, the result of which was the payment to each REAL limited partner of the Net Distributable Proceeds, payable on a per-unit basis to each REAL limited partner. Therefore, the plaintiffs' damages resulted from a direct injury to the limited partners, the hallmark of an individual rather than derivative claim. *Dowling v. Narragansett Capital Corp.,* 735 F.Supp. 1105, 1113 (D.R.I.1990).

The Court finds that because the Solicitations stated that the sale would result in the distribution of the sale proceeds directly to the limited partners, the instant case is distinguishable from the authorities cited by the defendants, and therefore, the plaintiffs have standing to maintain this action.

### D. *Conclusion: Breach of Fiduciary Duty*

The Court finds that triable issues of material fact remain regarding whether

NAPICO acted in the highest good faith or obtained any advantage over the REAL limited partners in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind. Therefore, with the exception of the Individual Defendants (who are not fiduciaries), the Court denies the defendants' motion for summary judgment on this ground.

## IV. State Law Claims

The CSRASC alleges additional federal securities and state law claims against the defendants.

### A. Anti–Bundling Claim

■ Rule 14(a)–4 of the Exchange Act sets forth the appropriate form for the proxy itself. Rule 14(a)–4 requires that the security holder be provided an opportunity to approve or disapprove each separate matter to be acted upon. In pertinent part, the regulation provides:

> The form of proxy ... (3) Shall identify clearly and impartially each separate matter intended to be acted upon, whether or not related to or conditioned on the approval of other matters, and whether proposed by the registrant or by security holders ... (b)(1) Means shall be provided in the form of proxy whereby the person solicited is afforded an opportunity to specify by boxes a choice between approval or disapproval of, or abstention with respect to each separate matter referred to therein as intended to be acted upon, other than elections to office.

17 C.F.R. §§ 240.14a–4(a)(3) & 240.14a–4(b)(1).

Whether a private cause of action exists for a violation of Rule 14(a)–4 is a question of first impression in the Ninth Circuit. In *Koppel v. 4987 Corporation, et al.,* the Second Circuit addressed this same issue,

also as one of first impression, and held that an implied right of private action existed under Rule 14(a) for violations of Rules 14a–4(a)(3) and 14a–4(b)(1). 167 F.3d 125, 135 (2d Cir.1999). Assuming, arguendo, that a private cause of action for a violation of the anti-bundling provisions exists in this circuit, the Court must now examine what constitutes "bundling."

In an anti-bundling claim, the question for the court is whether or not the issues that are bundled together constitute separate matters. *Id.* at 134. The fact that a proxy statement was filed or examined by the SEC shall not be deemed a finding by the SEC that the SEC has approved any statement contained therein. 17 C.F.R. § 240.14a–9(b). In *Koppel,* the Second Circuit held "that in the absence of explicit guidance from the applicable state law, the actual issue of what constitutes a 'separate matter' for purposes of the two rules is ultimately a question of fact to be determined in light of the corporate documents and in consideration of the SEC's apparent preference for more voting items rather than fewer." *Id.* at 138.

In the instant case, the plaintiffs claim that the Solicitations violated Rules 14(a)–4(a)(3) and 14(a)–4(b)(1) because the Solicitations improperly bundled: (1) consent to proceed with the REIT Transaction and (2) consent to sell the remaining assets of the REAL Partnerships. The challenged Consent Form for REAL I appeared to the Class as follows: [34]

## CONSENT OF LIMITED PARTNER

The undersigned hereby gives written notice to Real Estate Associates Limited I (the "Partnership") that, with respect to the transaction by which the Partnership proposes to sell certain of its real estate assets to a real estate investment

---

**34.** The Consent Forms for all the Solicitations contained substantially the same language.

trust sponsored by the affiliates of certain general partners of the Partnership or a subsidiary Partnership of the REIT, the undersigned votes on all of his, her or its units of limited partnership interest as indicated below:

On the proposal to sell all of the interests of the Partnership in the real estate assets of eight of the eighteen limited partnerships in which the Partnership holds a limited Partnership interest to a real estate investment trust or its affiliates to be organized by Casden Properties and to authorize the General Managing Partner to take any and all actions in connection therewith, including the execution on behalf of the Partnership of such amendments, instruments and documents as shall be necessary to reflect the transfer of the general and limited partnership interests *and to authorize the General Managing Partner to sell any remaining Real Estate Interests not transferred to such real estate investment trust or its affiliates pursuant to the proposal without further consent of the Limited Partner.*

(Defs' Mot., Ex. 31 at 3488 (emphasis added).)

The plaintiffs claim that the underlined language is a "bundled separate matter," which allows the defendants to transfer assets unrelated to the REIT Transaction without further consent of the plaintiffs. The plaintiffs contend that the phrase authorizes the sale of any and all of the remaining assets in the REAL Partnerships.

The defendants respond that the language of the ballot is simply a "catch-all" power designed to enable the proxy holder to do all that is necessary to effect the transaction for which the consent is solicited. The defendants contend that the plain language of the Consent Form, while "inartful" (Defs' Mot. at 19), does not support the plaintiffs' anti-bundling claim.

The phrase in question contains the language "pursuant to this proposal". (*Id.*) This language is limiting, and restricts the sale of "any remaining real estate interests" to those detailed in the Solicitations.

The Court finds that triable issue of fact exist with respect to the whether defendants "bundled" separate matters in violation of Rule 14a–4 of the Exchange Act, and therefore, summary judgment for the defendants is inappropriate on this claim.

### B. *Doctrine of Inherent Fairness*

In *Jones v. H.F. Ahmanson & Co.*, the California Supreme Court held that when a majority shareholder usurps a corporate opportunity or otherwise harms the minority shareholder, the majority shareholder must show it did not breach its fiduciary duty or the doctrine of inherent fairness. 1 Cal.3d 93, 108, 81 Cal.Rptr. 592, 460 P.2d 464 (1969); *see also Miles, Inc. v. Scripps Clinic & Research Found.*, 810 F.Supp. 1091, 1099 (S.D.Cal.1993). The doctrine of inherent fairness stands for the proposition that "[o]nce it is shown a director received a personal benefit from the transaction ... the burden shifts to the director to demonstrate not only the transaction was entered in good faith, but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." *Heckmann v. Ahmanson*, 168 Cal.App.3d 119, 128, 214 Cal.Rptr. 177 (1985). "The essence of the test is whether or not under all the circumstances the transaction carries all the earmarks of an arm's length bargain. If it does not, equity will set it aside." *Jones*, 1 Cal.3d at 108, 81 Cal.Rptr. 592, 460 P.2d 464 (internal quotations & citation omitted). The California Supreme Court specifically held in *Jones* that the doctrine of inherent fairness exists only between majority and minority shareholders. *Lynch v. Cook*, 148 Cal.App.3d 1072, 196 Cal.Rptr. 544 (1983);

*McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 884 (9th Cir.1994).

 The relationship between the defendants and the Class is not one of majority and minority shareholder, but rather of partners. While California law holds that a fiduciary relationship exists between general and limited partners, it does not hold that the doctrine of inherent fairness extends to partnerships. *Id.* The plaintiffs do not cite any authority to the contrary.[35]

Therefore, the Court grants the defendants' motion for summary judgment as to the plaintiffs' claim for breach of the doctrine of inherent fairness (Count VI in the CSRASC).

### C. Declaratory Judgment Regarding Indemnification

 The ripeness doctrine protects against premature adjudication of suits in which declaratory relief is sought. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). The basic rationale is to prevent courts from entangling themselves in abstract disagreements. *Abbott*, 387 U.S. at 149, 87 S.Ct. 1507. In order for an issue to be ripe for determination, two conditions must be satisfied: (1) the dispute must be sufficiently concrete to make declaratory relief appropriate, *Farm Sanctuary, Inc. v. Department of Food & Agriculture*, 63 Cal.App.4th 495, 502, 74 Cal.Rptr.2d 75 (1998); and (2) if a court declines to consider the issues, the parties will suffer hardship, *San Diego County*

*Gun Rights Committee v. Reno*, 98 F.3d 1121, 1132 (9th Cir.1996).

The plaintiffs seek a declaration that the defendants are not entitled to indemnification from the REAL Partnerships for the expense of this action. The parties do not dispute that the defendants will not be entitled to indemnification from the REAL Partnerships if there is a finding that the defendants violated Rule 14(a) of the Exchange Act or their fiduciary duties. *Riverhead Sav. Bank v. National Mortgage Equity Corp.*, 893 F.2d 1109, 1116 (9th Cir.1990). Because there is no case or controversy between the parties, the plaintiffs' claim for a declaratory judgment regarding indemnification is not sufficiently concrete to make relief appropriate. Therefore, the plaintiffs' claim for a declaratory relief does not meet the first prong of the test for ripeness.

Assuming, arguendo, that the plaintiffs' claim is sufficiently concrete to warrant a disposition, the parties will not suffer hardship if a decision on indemnification is delayed until after a trial on the merits. If the plaintiffs prevail, the defendants do not dispute that the defendants will not be entitled to indemnification, and that they will be required to repay the REAL Partnerships the costs of their legal fees as required by the REAL Partnership Agreements. Therefore, for the foregoing reasons, this Court finds that the matter of indemnification is not ripe for adjudication, and declines to rule on the matter at this time.

---

**35.** *Laux v. Freed* stands for the unremarkable proposition that a fiduciary relationship exists between two partners. 53 Cal.2d 512, 522, 2 Cal.Rptr. 265, 348 P.2d 873 (1960). There is no dispute that NAPICO owed the plaintiffs a fiduciary duty. In *Robinson, Leatham & Nelson, Inc v. Nelson*, the court does not apply the doctrine of inherent fairness to a partnership agreement, rather it dismisses the plaintiffs citing of the doctrine as being unrelated to the issue to be decided by the court. 109 F.3d 1388, 1391–92 (9th Cir.1997). *Wehner* holds that in a partnership between brothers, beyond fiduciary duties founded in law, an actual relationship of confidence and trust exists.

## D. *Rescission*

 Rescission is controlled by equitable principles. *Harman v. Diversified Med. Inves. Corp.*, 524 F.2d 361, 364 (10th Cir.1975). A condition of rescission is that the rescinding party must restore the other party to the status quo. *Beckwith v. Sheldon*, 165 Cal. 319, 324, 131 P. 1049 (1913). Where others have intervened, and the situation has so far changed that rescission can only be effected with injuries to those parties and their rights, rescission will be denied and the complaining party left to other remedies. *Id.* Generally, rescission of the entire contract is required; however, there are certain situations which warrant rescission only as to particular matters or parties of a transaction. *Simmons v. California Inst. of Tech.*, 34 Cal.2d 264, 281, 209 P.2d 581 (1949) (Carter, J., concurring). Rescission may be granted where the consent of the party seeking rescission was given by mistake, or obtained through duress, menace, fraud, or undue influence, by the party against whom rescission is sought. Cal.Civ.Code § 1689(b)(1). A claim for damages is not inconsistent with a claim for rescission; but if any relief is granted, the relief shall not include "duplicate or inconsistent items of recovery." Cal.Civ.Code § 1692. "Under true rescission, the plaintiff returns to the defendant the subject of the transaction, plus any other benefit received under the contract, and the defendant returns to the plaintiff the consideration furnished, plus interest. If true rescission is no longer possible ..., the court may order its monetary equivalent." *Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir.1999) (internal citations omitted). The general rule under rescission is that the party seeking rescission restores the person to the position he occupied before the transaction occurred. *Harman*, 524 F.2d at 364.

 The Class claims it can only be adequately compensated if its approval of the REIT Transaction, and the REIT Transaction itself, are rescinded. Specifically, the claim for rescission demands a return of the 98 Local Partnership interests transferred in the REIT Transaction to the REAL Partnerships.

The defendants claim that a rescission of the REIT Transaction is not a viable remedy because: (1) the parties cannot be returned to the status quo; (2) money damages are sufficient to compensate the plaintiffs' for their losses, if any; and (3) a rescission of the REIT Transaction would "foist upon the parties a deal to which they never agreed." (Defs' Mot. at 22:15–17.) Rescinding the full REIT Transaction requires at least: (1) a transfer of the 98 Local Partnership interests from the REIT to the REAL Partnerships; (2) a transfer of the Local GP interests from the REIT to the Local Partnerships; (3) the transfer of real properties owned by entities controlled by Alan Casden; and (4) the transfer of a controlling interest in NAPICO and its subsidiaries. (Defs' Mot. at 22:12–15.)

The plaintiffs commenced this action on August 27, 1998, four months prior to when the REIT Transaction closed on December 30, 1998.[36] While four years have passed since the REIT Transaction was finalized, the defendants' conclusory statement that the "plaintiffs ignore the harm [rescission] will cause to all the parties to this lawsuit" does not meet the defendants' burden of showing rescission is not a viable remedy. *First Fed. Sav. Bank of Hegewisch v. United States*, 52 Fed.Cl. 774,

---

**36.** While the suit was initiated prior to the REIT Transaction, the plaintiffs did not move for an injunction preventing the REIT Transaction from being completed.

796 (Fed.Cl.2002) (defendant's counterclaim for rescission, while dismissed on other grounds, still viable although filed 8 years after plaintiffs commenced the action). Additionally, while more complicated, rescission is not foreclosed as a remedy solely because all the parties necessary for a full rescission are not joined as parties to this matter. *Harman,* 524 F.2d at 365 (rescission equitable even though it required returning shares to shareholders not party to the action). Lastly, the defendants' claim that the parties cannot be restored to the status quo is conclusory. Therefore, the Court finds that the defendants do not carry their burden of proving, at this stage in the proceedings, that a claim for rescission is not a viable remedy under law. The defendants' motion for summary judgment on the plaintiffs' claim for rescission is therefore denied.

### E. Imposition of a Constructive Trust

A constructive trust is an involuntary equitable trust created as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner. *Communist Party v. 522 Valencia, Inc.,* 35 Cal.App.4th 980, 990, 41 Cal. Rptr.2d 618 (1995). California Civil Codes §§ 2223 and 2224 set out the circumstances under which constructive trusts are generally imposed. Section 2223 states: "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Cal.Civ.Code § 2223. Section 2224 states: "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Cal.Civ.Code § 2224.

■ The imposition of a constructive trust requires: (1) the existence of res (property or some interest in property); (2) the right of the complaining party to that res; and (3) some wrongful acquisition or detention of the res by another party who is not entitled to it. *Communist Party,* 35 Cal.App.4th at 990, 41 Cal. Rptr.2d 618.

■ The Class seeks the establishment of a constructive trust over money damages, if any, recovered by the plaintiffs (the defendants in the present action) in *Casden Properties Sub LLC, et al. v. Management Alliance Specialty Group, Inc. et al.,* 3:CV 00–1252, (filed July 14, 2000) (the "Management Alliance Suit").[37] The Management Alliance Suit, filed in the United States District Court for the Middle District of Pennsylvania, seeks damages for the retention of funds and breach of fiduciary duty by a Local General Partner for properties formerly held by the REAL Partnerships.[38] The Class claims that the losses caused by MA's wrongs occurred before the REIT Transaction, at a time when the REAL Partnerships held interests in the properties. The Class claims that a constructive trust over the damages is appropriate because: (1) the plaintiffs in the Management Alliance Suit acquired an interest in the properties, and possible money damages from the suit, as a result of the REIT defendants' wrongful acquisition of the Class' Limited Partnership interests in the REAL Partnerships; and (2)

---

**37.** The full caption in the Management Alliance Suit appears as follows: *CASDEN PROPERTIES SUB LLC, CASDEN PROPERTIES GP I LIMITED PARTNERSHIP, and CASDEN PROPERTIES GP II LIMITED PARTNERSHIP (plaintiffs) v. MANAGEMENT ALLIANCE, INC., MANAGEMENT ALLIANCE* *SPECIALTY GROUP, INC., THOMAS F. TORBIK, ANTHONY GROSEK, JR., AND HELEN C. GROSEK (defendants).*

**38.** Management Alliance ("MA") is a defendant in the Management Alliance Suit. MA is a former Local GP of REAL III, VI, and VII.

the Class has a right to the money damages, if any, from the Management Alliance Suit.

In order to prevail on a constructive trust claim, the Class must set forth all the three elements as established in *Communist Party*. The Court finds that issues of triable fact regarding this claim and deny the defendants' motion for summary judgment on the plaintiffs' claim for constructive trust.

#### F. *Accounting*

An accounting can be used to establish the existence as well as amount of liability. *Towers v. Titus*, 5 B.R. 786, 793 (N.D.Cal. 1979). An accounting is essentially a form of disclosure, predicated upon the legal inability of a plaintiff to determine if, or how much, money is due to him from another. *Bradshaw v. Thompson*, 454 F.2d 75 (6th Cir.1972). An action for accounting is available when the "complicated nature of accounts would make it difficult, if not impossible, for a jury to unravel numerous transactions." *Towers*, 5 B.R. at 793.

In *Dairy Queen, Inc. v. Wood*, the Supreme Court curtailed the availability of an equitable accounting, stating that:

> The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in *Beacon Theatres*, the absence of an adequate remedy at law. Consequently, in order to maintain such a suit on a cause of action cognizable at law, as this one is, the plaintiff must be able to show that the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them. In view of the powers given to District Courts by Federal Rule of Civil Procedure 53(b) to appoint masters to assist the jury in those exceptional cases where the legal issues are too complicat-

ed for the jury adequately to handle alone, the burden of such a showing is considerably increased and it will indeed be a rare case in which it can be met. 369 U.S. 469, 478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (footnotes omitted).

In *Lenz v. Associated Inns and Restaurants Co. of Am.*, the plaintiff, a limited partner investor in a tax shelter, brought an action for accounting against the general partners. 833 F.Supp. 362, 364 (S.D.N.Y.1993). Although the plaintiff signed a waiver of his rights to an accounting, the court examined whether the plaintiff would be harmed if the court denied an accounting of the partnership's books and records. *Id.* at 384. While the financial issues of the partnership were complicated, because (1) the plaintiff's interests had been fully served, (2) the plaintiff did not express dissatisfaction with the information provided during formal discovery, and (3) asserted his readiness to go to trial, the court denied the plaintiff's motion for an accounting. *Id.* at 385.

In the present case, genuine issues of triable fact exist regarding whether an accounting may ultimately be appropriate in this matter. While, as in *Lenz*, the plaintiffs have asserted their readiness to go to trial, triable issues of fact exist regarding the amount due to the plaintiffs, if any. Unlike in *Lenz*, the defendants have not established: (1) that the plaintiffs' interests are fully served; or (2) that the plaintiffs are satisfied with the formal discovery process. Additionally, the defendants, in opposition to the plaintiffs' motion for partial summary judgment, acknowledge that "[i]f the REAL Partnerships are owed additional money, the correct amounts can be determined in state court accounting actions." (Defs' Opp. at 12:22–23.) At this stage of the proceedings, factual questions exist concerning the amount and existence of the defendants'

liability. *Towers,* 5 B.R. at 793. Therefore, this Court denies the defendants' motion for summary judgment on the plaintiffs' accounting claim.

## V. Conclusion

For the reasons stated above, the Court: (1) denies the defendants' motion for summary judgment on the § 14(a) claim; (2) grants the defendants' motion for summary judgment on the breach of fiduciary duty claim against the Individual Defendants; (3) denies the defendants' motion for summary judgment on the breach of fiduciary duty claim against NAPICO; (4) denies the defendants' motion for summary judgment on the anti-bundling claim; (5) grants the defendants' motion for summary judgment on the doctrine of inherent fairness claim; (6) denies the defendants' motion for summary judgment on the plaintiffs' claim for declaratory judgment regarding indemnification; (7) denies the defendants' motion for summary judgment on the plaintiffs' claim for rescission; (8) denies the defendants' motion for summary judgment on the plaintiffs' claim for constructive trust; and (9) denies the defendants' motion for summary judgment on the plaintiffs' claim for an accounting.

IT IS SO ORDERED.